**In the Matter of the SCHEIB TRUST, Durwood K. Scheib and Robert C. Scheib, Trustees; and the Hattie K. Scheib Estate, Durwood K. Scheib, and Robert C. Scheib, Executors; and the Earl Scheib Estate, Durwood K. Scheib, Executor.**

**Appeal of Rona Dee PURPURA.**

**No. 88–1247.**

Court of Appeals of Iowa.

March 27, 1990.

G. Robert Sackett of Willis & Sackett, Perry, and Emil Trott, Jr. of Barrett & Trott, Des Moines, for appellant Rona Purpura.

Kirke C. Quinn and Bruce L. Anderson of Doran, Courter, Quinn & Doran, Boone, for appellee Robert C. Scheib.

Virginia Poffenberger of Poffenberger & Joy, Perry, for Durwood Scheib as executor to the Earl Scheib Estate.

Bryan R. Jennings of the Reich Law Firm, Adel, as guardian ad litem for any unborn beneficiaries.

Considered by OXBERGER, C.J., and DONIELSON and HABHAB, JJ.

HABHAB, Judge.

Appellant, Rona Dee Purpura, appeals from a district court order approving the application for authority to sell real estate owned by the two estates and one trust in this case. We affirm in part and reverse in part.

Earl Scheib and Hattie Scheib, trustors and testators of the two estates and one trust involved herein, had five children: Robert Scheib, Durwood K. Scheib, Marilyn McGraw, Max Scheib, and Rona Dee Purpura. Each of these children have issue. Max is now deceased.

The property at issue consists of approximately 1,000 acres of Iowa farm land. At all times material to this controversy, this land was a part of the (1) Scheib Inter Vivos Trust, (2) Hattie Scheib's Estate or Testamentary Trust, and (3) Earl Scheib's Estate or Testamentary Trust. There are parts of the decedents' wills that created the trusts and the inter vivos trust itself that are important to this controversy, so we will discuss so much of those provisions as are necessary to a better understanding of the problem at hand.

I.

*Scheib Inter Vivos Trust.* On December 23, 1975, Earl Scheib and Hattie Scheib

created the "Scheib Trust." We will refer to this trust from time to time as the inter vivos trust. Under the terms of the trust, Robert and Durwood were named trustees. The trustees were clearly prohibited from selling the two tracts of land which formed the basis for the inter vivos trust during the trustors' lifetimes. The trustees, however, were given the power to sell all or part of the land after the trustors' deaths, but only if each of their children "living at the time the trustees exercised said power to sell have consented in writing thereto...." The pertinent trust provision states:

> The trustees shall not have the power to sell the above real estate during the lifetime of the grantors herein, but after the death of both of the grantors the trustees shall have the power to sell any part or all of the real estate at any time provided that each child of the grantors living at the time the trustees exercise said power to sell have consented in writing thereto; ....

*Hattie Scheib's Will.* Hattie died testate on November 5, 1981. Hattie's will bequeathed all her personal property and the use of the home where she resided at the time of her death to her husband, Earl. Hattie then devised all her real estate and mixed property, except her home, to Durwood and Robert as trustees for the use and benefit of Hattie's children and grandchildren. The trustees were given the power to sell Hattie's real estate located in any city or town, but the will is silent as to any power to sell any of the farm land.

Hattie's farm land that is to pass to the trust constitutes a part of this dispute. The terms of her will directed Robert and Durwood to act as trustees. Hattie's will further directed the net income from the trust to be distributed equally among her children. It further provided:

> In the event of the death of any of said children, the share of said child shall be distributed equally among his or her children and upon the death of all of my children, then the remaining balance of funds on hand shall be distributed equally among my grandchildren per stirpes

and not per capita and the title to the real estate included in the trust shall vest in my grandchildren per stirpes and not per capita, it being my intention that the share of each of my children shall vest in his or her children so that the children of each of my children shall own an undivided one-fifth (1/5th) interest in my estate.

*Earl Scheib's Will.* Earl died testate in 1986. His will is almost identical to Hattie's in regard to the creation of a trust and the distribution of the net income. Earl, however, executed five codicils to his will. One codicil, executed on June 2, 1975, grants the trustees the authority to sell real estate of the trust created by his will if all the surviving children at the time of the sale give their consent. Durwood, by one of the codicils, is named as the sole executor and sole trustee. In the second codicil to Earl Scheib's will, the following provision appears:

> The trustees shall have the further power to sell any real estate owned by me, including any farmland which I own, at any time during the term of said trust, provided, however, that at the time of said sale all of my children and my widow surviving at the time of said sale shall have consented to the sale thereof.

## II.

Earl and Hattie are now deceased. Under the inter vivos trust, the farm land can be sold if all of their surviving children consent thereto in writing. Under the trust provisions in Earl's will, the farm land can be sold if the surviving children give their consent. As stated above, the trust provision of Hattie's will is silent insofar as the trustees having power to sell the farm land.

It appears from the record before us that all of the children have consented to the sale of the farm land in question except the appellant, Rona. She claims that she does not now nor has she ever given a binding consent to sell the farm land. The appellees argue to the contrary and claim that Rona gave her consent to the sale at a family meeting attended by all the children and some of the grandchildren and that she

should be estopped from denying that action.

Turning to the family meeting, after Earl's death discord between various members of the family occurred. A family meeting to discuss these differences was held on May 17, 1987. Virginia Poffenberger, then attorney for the executors, issued a letter memorializing the events of that meeting. In the May 17, 1987, letter, Ms. Poffenberger notes the family members present decided, among other points, "[t]o liquidate all the real estate, *if possible.*" (Emphasis added.) Poffenberger further advised the family members to contact her if they found errors in the content of her letter. Poffenberger subsequently notified the family by letter on August 18, 1987, that various members of the family did not wish to agree to various items contained in the May 17th letter. As explained later, we are not convinced that with the use of the words "if possible" that Rona's presence at this meeting is sufficient to constitute the consent necessary to sell the farm land from the inter vivos trust.

A substantial part of the family disharmony centered around Durwood and Robert and their performances as personal representatives under their parents' estates and as trustees under the inter vivos trust. Their disagreements came to a head when, on November 9, 1987, Robert, as a beneficiary of his father's estate, filed a petition for removal of Durwood as executor of that estate. On January 21, 1988, after a one-day trial, Durwood and Robert entered into a settlement agreement[1] which, among other things, provided for the sale of all farm land involved in this controversy. They then filed an application asking the court to approve the settlement agreement and further asked that the court take jurisdiction of the inter vivos trust.

The district court granted Durwood and Robert's application and took jurisdiction of the inter vivos trust under section 633.-10(4). There the matter rested until June 23, 1988, when Robert filed another application to remove Durwood as trustee and executor. He claimed that Durwood failed to carry out the January 21, 1988, agreement. Robert, in the same application, asked for authority to sell real estate. The written consents of Robert C. Scheib, Marilyn McGraw, and Durwood K. Scheib were attached to the application. Rona did not consent.

The second application for removal and the application for authority to sell real estate was fixed for hearing on July 20, 1988. Notice of this hearing was given to all interested parties. Durwood filed an answer in which he asked the court to deny the application to sell.[2] Rona also filed a written resistance to the application. On July 20, 1988, hearing was had on Robert's application. The district court ruled from the bench that Rona was estopped from objecting to the sale of the real estate. On August 5, 1988, the district court filed its written decision. The decree required Robert and Durwood to submit their resignations as fiduciaries and that the Valley National Bank or other corporate fiduciary would be appointed in order to conduct a sale of the real estate to family members. It also set an August 19, 1988, hearing date on the final report of the executor of Earl's estate.

On August 11, 1988, Durwood, the executor of Earl's estate, filed an application to continue the August 19th hearing. On August 15, 1988, the district court set a hearing on the application to continue for August 17th. At the August 17th hearing, which was attended by only Robert's attorney and Earl's estate's attorney, the district court ordered a modification of its earlier August 5th decree. The district court ruled that Robert should remain as the sole executor and trustee and carry out the family sale of the real estate.

Rona filed her notice of appeal from the August 5th order on August 17, 1988. On

1. None of the other interested beneficiaries are parties to this agreement.

2. Durwood had previously signed a written consent to sell the land. At trial, this consent was not retracted; and he testified notwithstanding his resistance, that he was in agreement to sell the farms.

August 24, 1988, the district court filed its written order amending the August 5th decree. In this order, the district court ordered the family sale to be held prior to August 30, 1988.

On August 25, 1988, Rona filed a writ of certiorari with the Iowa Supreme Court in which she asserted the district court had exceeded its authority and jurisdiction by its order of August 24. This writ was denied. Rona filed a supersedeas bond and a three-hundred-dollar ($300) cashier's check, but it was rejected by the clerk of court as being insufficient.

On August 27, the family auction was held. The property was sold as five parcels with Robert purchasing three, Durwood purchasing one, and Charles Scheib and Emmert Scheib, two of Robert's sons, purchasing the remaining parcel. On September 12, Robert reported the sale of the real estate and requested the court's approval of the five land contracts. Rona filed her objection to the sale on September 13. On September 23, the district court entered an order approving the report of the sale of the real estate.

In this equity action, our review is de novo. Iowa R.App.P. 4. We have a duty to examine the entire record and adjudicate anew rights on the issues properly presented. *In re Marriage of Steenhoek*, 305 N.W.2d 448, 452 (Iowa 1981). We give weight to the fact findings of the trial court, especially when considering the credibility of witnesses, but are not bound by them. Iowa R.App.P. 14(f)(7).

### III.

The first issue which needs to be addressed is appellees' assertion that Rona's failure to file a sufficient supersedeas bond in order to prevent the sale of the real estate causes this action to be rendered moot. Appellees' argument on this point is without merit. The Iowa Supreme Court held in *Spring v. Spring*, 210 Iowa 1124, 1128–29, 229 N.W. 147, 149 (1930), that the absence of a supersedeas bond does not deprive a party of the right to be heard on appeal. *See also Mason's Estate v. Sagehorn*, 303 S.W.2d 194, 195–

96 (Mo.Ct.App.1957). Therefore, since a live controversy is before this court, we can proceed to address the other issues raised by the parties.

### IV.

The next issue we take up is whether the district court erred in holding Rona consented to the sale of the farm land in the Scheib inter vivos trust and was accordingly estopped from objecting to the sale of the real estate. We note initially that the farm land in this trust cannot be sold without the written consent of the surviving children.

The trial court's basis for finding Rona had consented to the sale of the various entities' farm land stems from the family meeting held on May 17, 1987. Upon receiving Attorney Poffenberger's letter of May 19 memorializing the decisions of the meeting, Rona called to inquire about the circumstances and conditions upon which a sale would take place, the obvious import of this action being Rona had not given unqualified consent to the sale of the farm land. Furthermore, any consent given by Rona at the family meeting was ostensibly contingent upon the occurrence of the other events agreed to at the family meeting. Poffenberger's letter of August 18, 1987, clearly and unequivocally discloses that various family members disagreed with her letter of May 19 and did not wish to go forward with the plans outlined in that letter.

Rona made no subsequent statement nor took any action indicating that she wished to have the farm property sold. The district court, however, relied upon Rona's failure to specifically withdraw her consent as the basis for estopping her from objecting to the sale. The elements of promissory estoppel are:

> (1) a clear and definite oral agreement, (2) proof that the party urging the doctrine acted to his detriment in relying on the agreement, and (3) finding that the equities support enforcement of the agreement.

*Warder & Lee Elevator, Inc. v. Britten,* 274 N.W.2d 339, 342 (Iowa 1979); *see Merrifield v. Troutner,* 269 N.W.2d 136, 137 (Iowa 1978).

We find there was no clear and definite agreement upon which to premise an estoppel claim against Rona. The family meeting "agreement" was a tentative agreement at best. Additionally, as Poffenberger's letter of August 18 attests, the various parties to it disagreed as to what had transpired and, in any event, did not wish to pursue it. It must further be noted that any reliance on Rona's "consent" by Robert or Durwood was without justification. Rona was never informed of the terms of the settlement agreement prior to the district court's approval of it. When Rona received the settlement agreement, she immediately called Poffenberger to inform her of her disapproval of it. This was prior to the expenditure of estate funds in implementation of the settlement agreement.

Factually, it appears that Robert disapproved of the sale after the family meeting. Poffenberger testified that Robert had informed her after the family meeting that he did not want to sell the farm land. When we consider Poffenberger's testimony as a whole, she is quite adamant that Rona was opposed to the terms and conditions of sale as promulgated by her brothers. To buttress Poffenberger's testimony, during the meeting when the terms and conditions of the sale were considered, she asked on at least two occasions that the two sisters, who were not present, be called and informed as to what was transpiring. Her requests were ignored. Robert, in his testimony, verified that he did not consult with his sisters concerning the provisions of the settlement agreement.

While silence may, under certain circumstances, give rise to an estoppel claim, the facts before us in this matter fall far short of the target. *See Keokuk State Bank v. Eckley,* 354 N.W.2d 785, 792 (Iowa App.1984). As mentioned above, after Poffenberger's letter of August 18, there was no reason for Rona to inform anyone that she would not consent to the sale of the farm properties since the gist of that letter was that everything was on hold. Additionally, when Robert and Durwood did get down to working out the settlement agreement, an agreement entered into by the two of them but which involved the sale of land which had an affect on other family members that were not present or parties to the agreement, they twice informed Poffenberger that she didn't have to contact Rona about consenting to it. It would be inequitable to use Rona's silence against her when Robert intentionally withheld information from her which, in all likelihood, would have prompted a response from Rona.

We find no basis for the district court's estoppel claim. Since Rona had not consented to the sale of the farm land, the sales of the farm property in the Scheib Trust must be considered invalid. Those sales are set aside.

### V.

We turn next to the farm land that stems from Hattie's and Earl's estates. We note at the inception that the various applications to sell the real estate in question were made by the personal representative as executors. There is no indication that the trusts under those wills were ever activated. Thus we need not consider the affect of the consent requirements under the trust provisions of Earl's will; nor need we address that part of Hattie's trust that fails to give the trustees the authority to sell the farm land.

But we must direct our attention to the statutory provisions that relate to the sale of decedents' land by the personal representative. The section relied upon by the appellee and the trial court is section 633.386 of the Iowa Code. That section gives the personal representative the authority to sell the land of his decedent for any of the purposes enumerated therein. A time and place for hearing on the application to sell was fixed by the court. Notices were mailed to all interested parties in conformance with the order of court, and a

guardian ad litem was appointed. There was one objection filed.[3]

The trial court, after considering the merits of the objectors' objection, concluded that it was in the best interest of the estate that the farm land in question be sold. Although our review is de novo, we see no reason to disturb that finding. We have also reviewed the proceedings concerning the sale of the land and we see no reason to set aside those sales. Accordingly, we affirm the trial court on this issue, and in doing so, we approve the sale of the farm land from the estates of Earl and Hattie.

## VI.

The next issue we address is whether the district court's order of August 24, 1988, is void for lack of subject matter jurisdiction.

 The general rule is that the timely filing of a notice of appeal places sole jurisdiction of the matter in the appellate court. *See In re Estate of Tollefsrud,* 275 N.W.2d 412, 417 (Iowa 1979). Iowa Rule of Civil Procedure 120 provides in relevant part:

> A judge may enter judgments, orders or decrees at any time after the matter has been submitted, *effective when filed with the clerk,* regardless of where signed.

(Emphasis added). The supreme court, however, has declared:

> "[A] judgment is rendered when it is announced or when the judge writes in his calendar a statement of his decision, or a jury returns a verdict but ... there is no competent evidence of such rendition until the entry is made on the court record." We believe these principles are equally applicable with respect to orders. Accordingly, we conclude that an oral order may be probative evidence as to the effective time of an order, but until it is in some manner reduced to writing and filed there is no competent evidence of the rendition of such order.

*Lutz v. Iowa Swine Exports Corp.,* 300 N.W.2d 109, 112 (Iowa 1981) (citations

omitted and quoting *Morene v. Vietor,* 261 Iowa 806, 810, 156 N.W.2d 305, 307 (1968)).

 The order involved in the case sub judicia was rendered on August 17th, prior to the time appellant perfected her appeal. As such, the trial court here is permitted to enforce its order for it was rendered prior to appellant's appeal. It must be remembered that a trial court may enforce its judgment during appeal unless a supersedeas bond is filed. *Lutz v. Darbyshire,* 297 N.W.2d 349, 352 (Iowa 1980). No new order was made here after the appeal was taken. *Cf. Hulsing v. Iowa Nat'l Mut. Ins. Co.,* 329 N.W.2d 5, 7 (Iowa 1983) (trial court could not make a "new order" after appeal was taken). We conclude that the district court's order of August 24th was not void because of a lack of jurisdiction.

AFFIRMED IN PART AND REVERSED IN PART.